Kirk et al. vs. Kansas City, Shreveport & Gulf R. R. Co.

## No. 13,042.

## J. I. KIRK ET AL. VS. KANSAS CITY, SHREVEPORT AND GULF RAILWAY CO.

51 667
51 666
51 667
104 88
51 667
107 774
51 667
f119 356

### SYLLABUS.

(1) An act by which land owners granted a right of way over their land to a corporation for the construction of a railroad, wherein the consideration stated was one dollar, and the advantages, benefits and conveniences resulting from the building of the road and the enhancement in value of their adjacent property, evidences, not a donation pure and simple, but a commutative contract.

(2) While such a contract does not relieve the corporation from the affirmative continuing obligations devolving upon it from the building of the road, nor from responsibility for damages to the land owner subsequently actually accruing from its faulty construction, yet claims which would have been within and gone to make up the original damages or compensation that would have been assessed against and paid by the company as the condition precedent to the right of way in an expropriation proceeding—matter which must have been known, foreseen and anticipated—must be held to have been considered and included by the parties as being within the consideration agreed upon when they balanced advantages and disadvantages.

(3) It is the duty of a railroad company where its road crosses a water course, or would interfere with its flow of water or interfere with the drainage of adjacent lands, to construct the road so as not to impair its usefulness or do injury to the owners of the lands along the route—this duty is a continuing one, and where the road is not properly constructed each overflow incurs new cause of action for damages.

(4) A railroad company cannot on the ground of its being a *quasi* public corporation build its road so as to serve its own interest and be permitted to do so to the injury of those who are as much entitled to the full benefit of their own property as the company is of its. If the exigencies of the situation should be such as to require absolutely and necessarily the building of the road in a manner which carries with it injury to other parties, the company is bound to hold them harmless from such damages for usurpations and wrongs to private rights of property, and cannot be justified by considerations of benefit to commerce.

(5) If the mill and mill site of the land owners have been injured by the acts of the railroad company, they would be entitled to require that it replace the property in thoroughly safe condition. It has no right to expect that the owners should advance money out of their own pockets to relieve themselves from an injurious situation brought about by it to which they, in no way, contributed.

ON APPEAL from the Twelfth Judicial District Court for the Parish of Vernon. *Read, J.*

*Scarborough & Carver* for Plaintiffs and Appellees.

*T. Alexander* and *Pujo & Moss* for Defendant and Appellant.

Argued and submitted February 8, 1899.
Opinion handed down March 20, 1899.

The opinion of the court was delivered by

NICHOLLS, C. J.   Plaintiffs asked judgment against the defendant for $6,000.

The case was tried before a jury, which having returned a verdict for the plaintiffs for twenty-five hundred dollars, judgment was rendered accordingly, and defendant appealed.

Plaintiffs alleged that they were joint owners of certain property which they fully described.

That they had sold the defendant the right of way across the said land, consisting of a strip of one hundred feet, as shown by copy of the act of sale, which they annexed to their petition.

That there was situated on said land the home and family residence of J. I. Kirk, one of the plaintiffs; also a store house, at which he had theretofore conducted his mercantile business, also a valuable water mill at which he had theretofore conducted his saw mill business.

Petitioners further represented that in the construction of said road, the said railway company negligently, carelessly, wantonly and inexcusably, wrongfully, improperly and unadvisedly constructed said road bed in such a manner as to greatly damage their property by reason of the manner of the construction of said road bed.   They further represented that the residence was situated about two hundred feet from the mill and site, on or near the bank of the mill pond in which water was collected for the use of the mill in running the same; that the store house was situated about two hundred feet from the residence, and almost south of the mill house, and both of which were about two hundred feet west of the residence.

They further represented that their mill pond, which was very valuable, was the only place on their property where a mill pond could be constructed with a stream that afforded a constant flow of water, making it possible to operate said saw mill by water, at least nine months of the year.   That with the water furnished by said stream, made available by the situation of their mill pond, said mill was capable of cutting ten thousand feet of lumber a day during nine

months of the year. That this amount of lumber could be cut at a very small expense, it not requiring over four hands to operate the mill under these conditions.

They also represented that while it was not necessary to do so, said Railway Company wantonly, illegally and improperly constructed its road bed immediately across petitioner's mill pond, driving heavy piling in the construction of the same, building their road bed immediately between the residence and the mill house and between the residence and the store, constructing a very high embankment, closing up all the drains across the swamp of the stream on which the mill is situated, thereby impeding the flow of water at high water times, jarring, bursting up and ruining the mill site by driving the enormous lot of piling near the mill house so as to utterly destroy and ruin the present mill property as constructed, destroying the mill site for future use; completely destroying the residence, the dwelling house and the site on which it is situated for residence purposes, completely destroying the business stand on account of the building of an immense embankment right at it, so that customers could not get to or from, nor the proprietor, to or from the mill house or the other house, without crossing said embankment.

They further represented that with the construction of a railway through the parish of Vernon, the value of its water mill would be very much enhanced, that is to say, the possession of a water mill which could be operated for the purpose of sawing lumber near a railway line would become a very valuable piece of property, and that the manner in which this road was constructed utterly destroyed the present and all future value to the owners from such mill and mill site, place of residence and place of business.

Petitioners therefore represented that they had been damaged in the sum of six thousand dollars ($6,000), for which they desired judgment against said railway company.

Defendant answered, pleading, first, the general issue. It admitted that it acquired the right of way through lands of plaintiffs, as described in the copy of deed annexed to plaintiffs' petition, and that the road bed was constructed thereon.

It also averred that the said road was properly located and constructed through said land, with all due regard to the topography of the country, as well as the rights and interest of the plaintiffs.

It denied that plaintiffs had suffered any special damage whatever

from the construction of its road through said lands, or any damage of any kinds not contemplated and included in the right of way granted and conveyed by them to the Railway Company. And further, it specially denied that the mill or mill site of plaintiffs was injured in any way, or suffered any damage which was occasioned by any act or fault on the part of respondent or its employees, contractors or agents. That said mill was old, poorly constructed, of little value and subject to washouts, which had been of frequent occurrence prior to the location or construction of the railroad in its vicinity, and if any washout occurred subsequent to said location and during the construction of the railroad, as alleged, same was due to inherent defects in the mill itself and appurtenances, and not to any fault of respondents.

On the twenty-sixth of June, 1896, an act *sous seing prive* was passed between the plaintiffs and the defendant, in which the plaintiffs, for and in consideration of one dollar ($1.00), and the advantages, benefits and conveniences resulting from the building of the Kansas City, Shreveport and Gulf Railroad Company through their lands, and in further consideration of the enhancement in value of their adjoining lands by the construction of their railroad, did thereby sell, convey and deliver unto said Railroad Company, its successors and assigns, the right of way over and across a certain tract of land situated in the parish of Vernon, described in the said deed; the right of way granted being one hundred feet in width, as then surveyed, or might be located, with the privilege to the Railroad Company of cutting down all trees along the line of the right of way outside of its limits, which in falling might reach the track. The right of way was declared to be given in perpetuity, so long as it should be used by said company, its successors or assigns, as a railroad company.

The line of location was established by survey and known to plaintiffs at the time the right of way deed was executed.

On this tract of land was a water mill, storehouse, dwelling and stable, etc.

During the construction of the road in January, 1897, and while piles were being driven in the mill pond, the sluice way in which the gate was placed washed out, and also the mill foundation. The mill remained and is still in place.

The mill was a wooden structure with similar foundation, built in 1858, and was used for ginning cotton, grinding corn and sawing

lumber. Its lumber manufacturing capacity is testified to as being from 600 to 4000 feet a day, board measure. Its ginning and grinding capacity is not shown by the record with any degree of certainty.

After the break occurred no effort was made to replace or repair the foundation, and it was at the time of the trial in the same condition as when the washout took place.

While the road was in course of construction, the store building was removed from the right of way, at the expense of the Company, by Mr. Foster, the tenant of plaintiffs, to the place it occupied at the time of the filing of this suit, about thirty-four feet from the right of way.

The embankment between the dwelling and store is six feet high, and at this point a crossing was put in at grade, with filled approaches, so as to make it an easy pull for teams.

The mill is 119 feet 5 inches, and the dwelling 130 feet from the center of the track.

The mill is located on East Anacoco, about fourteen miles from its source, at a point where the channel is about three hundred feet wide, and the land on both sides makes what is known as a "bottom," having a width of 2600 feet, including bed of creek.

In the construction of the road it became necessary to cross this bottom or low land and creek, which was done by filling and bridging, the fill covering 1956 feet and the bridge 644 feet.

The entire mill pond and part of the low overflowed land was bridged, and the road was constructed so as to allow ample water way, according to defendant, and insufficient water way according to plaintiffs.

The mill dam is one hundred and thirty-four feet from the dam.

At the time of the washing away of the gate in the sluice way, and the break in the foundation, there were about seven feet of water in the pond, which, according to the testimony of plaintiff and Foster, was not sufficient to cause the break which they attribute to the jar caused by the driving of piles.

Several breaks had previously occurred in the damaged mill foundations, some when one Dr. Payne was operating the mill, and others while it was in the possession of Foster, and as late as 1896.

Foster and his son, both witnesses for plaintiff, say that when the piling was being driven, the jar could be felt in the mill, and the saw would ring at each stroke of the hammer.

Knoble, the locating and constructing engineer in charge of the work, says that no damage was caused, in his judgment, on account of the construction of the road.

Randall, the foreman in charge of the bridge gang at the time of the washout, says that the water was high and the dam broke once in the night and two or three days later it broke again at 12:30 in the day time, the last break causing the washout of the foundation. He further says, "there was a quicksand foundation where the break occurred, and it was caused by the high water."-

John Franklin, one of the defendant's witnesses, testified, that the mill had settled down at the northeast corner, the result of a former break in the dam.

In describing the mill, Knoble says: "It was a small, primitive mill, operated by water power collected in a pond just above the mill. The total cost of construction probably was five hundred dollars when first constructed, covering both mill and dam."

The value of the property testified to by the witnesses ranges from one thousand to five thousand dollars, at the time of the construction of the road, and $500 after the washout.

Plaintiff and all of his witnesses fixed the value of the property as an entirety, previous to the washout, at from twenty-five hundred to five thousand dollars, and after the break, at five hundred dollars.

T. C. Wingate, who had been for several years assessor, said that a fair valuation before the break would have been one thousand dollars, and that if the dam and mill were repaired it would be worth as much as before the railroad was built.

J. P. Cain, also one of defendant's witnesses, testified that the reason that the mill was no longer valuable was because it was no longer profitable to operate it in competition with the large saw mills along the line of the railroad.

## OPINION.

While the plaintiffs in their pleadings describe the deed between themselves and the defendant, as an act of sale, they maintain in their brief that such is not its character. That to have made it such it would have been necessary that there should have been a price in money, and that the price should have been serious and in proportion to the value of the thing sold; that otherwise, it would be considered a donation, citing in support of this position Article 2454 of the Civil

Code, Nugent & Co. vs. Buisson, 35th Ann. 108, Groebel vs. Ristroph, 35th Ann., 490, Barrow vs. Wilson, 39th Ann., 410.

They further contend that the right granted was a "mere floating permit to enter and locate a right of way." That to constitute a sale, the thing sold must be definite, or the act would be void for uncertainty, (quoting Pargoud vs. Pace, 10th Ann., 613, Green Brothers vs. Witherspoon, 37th Ann. 751, and Woods on Railroads, Vol. 2, page 94, Sections 208-211).

They insist that the deed was "a donation in disguise"—in reality a donation.

Starting from this premise, they argue that where a citizen, out of a spirit of liberality, has seen fit to generously donate the right of way requiring no compensation for the land taken, he does not lose any of his rights other than the right to demand compensation for the land actually taken; that in other respects the rights of the parties are just as they would be if a formal proceeding for the expropriation of the property had been instituted by the railway company. They refer the court on this subject to Volume 14 of the American Railway Cases, page 398, and to the case of Stodgill vs. Chicago, Burlington Railway Company; to Woods on Railways, Vol. 14, Sections 208-211, to Am. Ry. C., Vol. 14, page 398, Boudier & Bellcsein, 35th Ann., 947; Railroad Company vs. Dillard, Foster et als. 35th Ann. 1045; Railway Co. vs. Murrell, 36th Ann. 346, and Payne vs. Railroad, 38th Ann. 164.

Assuming this position to be correct, and that they occupy to-day precisely the same position which they would have occupied had no deed been passed between the parties (except as to non-liability by the railway company for the price of the land actually granted for the right of way), plaintiffs charge that the railway company, in locating the right of way, adopted that one of the three surveys which it had caused to be made, which was most injurious to them; that the injury to them was so great that it practically destroyed the mill property and mill site. That the special use of the property as a mill and mill site was its chief and almost exclusive use, and that for this destruction the defendant company is liable.

In arguing as to the duties of Railway Companies in making the works necessary for the construction of their roads on lands legally expropriated, they say that this court has repeatedly announced as a rule of law, that a railroad company, in enforcing its right of way

over the lands of others, and in constructing its road, should leave the adjoining lands and fields which it crosses in the same condition as regards the facilities of cultivation and as concerns the utility of these lands to their owners as they were before the entry of the railroad company; that a railroad which constructs an embankment on the lands of a planter, and thereby stops up his ditches and other artificial drains, is responsible to such owner for all losses of crops and other damages occasioned by such interruption of his drainage.

That in obtaining the right of way a Railroad Company does not thereby obtain the right to divert the water from its natural flow to the injury of the land owner.

They say that these views are in accord with those of the Supreme Courts of other States, and of text writers, as would appear from examination of Third (3) Elliott on Railroads, Section 1005, Woods on Railroads, Vol. 1, page 698, Edition of 1894; Woods on Railroads, Vol. 14, Section 208, 211; American Railway Cases, Vol. 14, page 398; Fowler vs. N. H. & R. R. Company, 112 Mass., 334; 57 Georgia, 178; 56 Penn., 445; Woods on Railroads, Vol. 1, pages 213, 214, 218, 219, 220; Hatch vs. Vermont Central Railroad Company, 25th Vermont, page 857.

There can be no doubt that a railroad is not authorized by reason of having obtained a right of way, to subsequently construct its works without reference to the rights of others, nor at liberty to consult simply its own interests, to the injury of the owners of the land expropriated. The decisions of this court, cited by the plaintiffs, command our approval, and would serve us as guides under a proper state of facts, but we think they are not applicable under those disclosed by this record.

We do not accept as correct the broad proposition advanced by the plaintiffs, that they occupied, after the execution of the deed between themselves and the defendant, the same position which they would have occupied had that deed not been passed and the present suit were one by the present defendant asking as a plaintiff an expropriation of the right of way, with the present plaintiffs as defendants advancing against the railroad all claims which the situation would warrant or justify it in making, in order to fix the amount it would be entitled to receive as compensation for the right of way.

We could not reach such a result without disregarding the conventional agreement made between the parties.

The deed may not be technically a sale, but it is not a donation pure and simple, nor a disguised donation.

The parties were dealing with each other with reference to a matter in which they each had an interest, and as to which each had the capacity to contract.

There is no charge that there was any error, fraud or misconception as to what each was agreeing to. They measured each other's advantages and disadvantages, and the deed between the parties, as it stands, evidences a commutative contract, where what is done, given or promised by one party is considered an equivalent to or a consideration for what is done, given or promised by the other. (Civil Code, Article 1768.)

How can it be asserted that the act evidences a mere donation, pure and simple, by the plaintiffs to the defendant, when they declare the consideration of the grant of the right of way to be not only the one dollar mentioned therein, but the advantages and conveniences to be derived by the plaintiffs from the construction of the railroad and the enhancement of the value of their adjacent property?

True, their expectations on this subject may not only not have been realized, but the building of the road may have, on the contrary, resulted in great injury to their interests, but that fact does not alter the character of the deed.

If there be a valid existing cause for a contract, it is immaterial that it should not fall under some contract particularly named or classified in the code. (C. C. 1777; Helluin vs. Minor, 12th Ann. 124.)

It is evident that if the railroad company, being plaintiff in an expropriation proceeding for a right of way over the lands of the present plaintiffs, the parties pending the suit should have drawn up an agreement couched in the identical language of the deed filed in this case, and the defendant in the suit should have consented that judgment be rendered in favor of plaintiffs, according to the term of the agreement, and judgment should have been rendered in the case, the railroad company would have been decreed the right of way without any monied judgment against it    Could it be claimed that, thereafter, the owners of the land, without any damage having been subsequently, actually sustained, could bring suit against the company for compensation for claims which might legitimately have been urged by them as the compensation for or as the price of the right of way?

We think not. Claims which would have been within and would have gone to make up the original damages or compensation that would have been assessed against and paid by the railroad company as the condition precedent to the condemnation of the right of way in an expropriation proceeding, must be held to have been considered and included by the parties as being within the consideration agreed upon when they balanced advantages and disadvantages. Elliott on Railroads, Vol. 3, Sec. 937, page 1300; Lewis on Eminent Domain, Section 567 and authorities. Wood on R. R., Vol. 1, page 698.

Would the situation when a "judgment" has been rendered, resting upon the deed as a basis, be different from that which would exist where no judgment has been rendered, and the parties stand upon the deed itself?

We are of the opinion that it would not.

The judgment would have rested exclusively upon the rights and obligations fixed in the deed itself; the decree would neither have restrained nor broadened them.

If so, the parties stand without the judgment, precisely where they would with it.

The plaintiffs cannot say that the line of the right of way was uncertain, not fixed.

The deed refers to the right of way, as to be either on the line of the survey then made or on the line which might thereafter be located. There was no objection made to the location of the road, either at the time or since. If, however, the place for the exercise of the servitude had not been fixed in the deed of the right of way, the owners were bound to have fixed the place where they wished it to be exercised. (C. C. 779.)

It is too late for them to complain of the location after they have stood by and seen the road constructed without complaint. Patout vs. Lewis, 51st Ann., 210.

Plaintiffs' claim (urged through the testimony) that the road had separated the buildings upon their property; that the residence was so near the embankment and the latter so high as to greatly disfigure the place and interfere with the comfort of the occupants; that the store was so close to the embankment as to frighten the horses of the parties dealing at the same; that the water in the trenches dug along the line for the fillings were calculated to breed disease; that the stock upon

the property was liable to be killed by going upon the track, have no merit in them.

The company paid the tenant himself upon the place, for the removal of the store from one side of the embankment to the other side, and there is nothing to show that it was not placed precisely where the parties desired it to be placed.

It further constructed a road to and over the embankment, so as to enable the owners to have free communication between the different parts of the property.

No stock has been shown to have ever been killed on the track, nor any disease to have been engendered by standing water.

We were under the impression from plaintiffs' pleadings, that they would attempt on the trial to show that the washing out of the foundations of the mill while the railroad was in process of construction was due to the fact that the company, instead of carrying a trestle work over the entire flat bottom lying near the mill, as they claimed should have been done, had done so only partially, and thrown a solid embankment up along the balance of the way.

That by reason of this embankment the escaping, overflowing creek waters had been backed up therefrom; the foundations of the mill had been washed out and the mill itself destroyed. Instead of this, the testimony of the plaintiffs went to show an entirely different cause for the washing out of the mill's foundations.

According to the plaintiff's witnesses, the officers and employees of the defendant drove large pilings into the ground with heavy pile drivers in near proximity to the mill.

This caused such violent vibrations that they reached the mill, shaking out a small portion of its foundations, and the waters rushed out, destroying the remainder, or a large part thereof.

Defendant, on the other hand, attributes the washing out to the fact that Foster, the tenant of the plaintiffs, had raised the dam two feet higher, while the pile driving was going on, and water was higher (although not on account of any freshet) than it was usually.

Ransdell, the engineer of the company, testified that the natural flow of the water was not changed, but there was simply more pressure against the dam; that the mill foundations were bad.

It would be exceedingly difficult for us to decide which of the two theories as to the cause of the accident is correct, for each is plausible.

We are not called on to do so, for the reason that whether it be one

or the other, the record does not, under our view of the evidence as it stands, disclose any proper basis for a present monied judgment in favor of the plaintiffs on that particular score.

Instead of making the washing out of the foundations of the mill the subject of a substantive, specific claim for the damages occasioned thereby showing the amount required to replace matters as they were and what the amount of profits were which were lost during a reasonable time within which repairs should have been made after the break, the plaintiffs have merely sought to avail themselves of the washout as a fact tending to show the destruction or ruin of the "mill site" itself as a future place of business.

Had plaintiff's demand been one for damages to the mill, and had the amount of the same been shown, as also the fact that they were caused by the acts of the defendant company, the situation would have been different from what it is.

We do not give to the fact itself of the washout the probative force for the purpose for which it is sought to be utilized, which the plaintiffs, the jury and the District Judge have given to it.

The testimony, we think, negatives the idea that the break was occasioned by water, backed up by reason of a solid embankment having been placed where there should have been a trestle.

There was no evidence to show that at the time of the "washout" the condition of the waters around the mill had been in any way made more dangerous by the construction of the railroad. On the contrary, the water was not then at a high stage, although Foster seems to have held it himself higher than there was any necessity for.

If the break was occasioned as Foster and other plaintiffs declared it was, by the violent vibrations of the earth caused by blows of the heavy pile driver upon piles driven by the defendant company into it, that particular cause of danger will be eliminated for the future, as the necessity for such driving of piles will no longer exist. Plaintiffs' theory is that the worthlessness of the mill site as such for future time by the improper construction of the railroad is an absolute present, existing fact, and that this being the case, they are authorized to claim and show the amount of damage which they have sustained by that fact.

This they sought to show by establishing the value of the tract of land including the mill site just before the break and comparing it with the present value.

We do not think that the worthlessness of the mill site as such for future time, by reason of the improper construction of the railroad, has been shown to be an absolute, present, existing fact.

There does not seem to have been, up to the time of the rendering of the judgment, any testing as to what effect the construction of the road as made would have as a permanency on the mill site; it has not been shown that the waters have ever been, since the building of the road, as high as fourteen feet in the mill pond, a height which it had sometimes reached before the construction of the embankment, without the mill's washing out; nor shown that it had since that time ever been so high in the bottom lands as to cause a horse to swim there, as Foster says he had seen it before.

The strongest evidence in the case in respect to an injurious effect of the construction of the road upon the mill and mill site is found in the answer of Knoble, the engineer of the defendant, to the sixteenth cross interrogatory propounded to him, in which he was asked, whether he considered that the old mill site was then as good for mill purposes as it ever was? That is, whether it had or had not been at all interfered with by the construction of the road?

His reply was: "In time of very high water it would require a stronger constructed building to withstand pressure of water at old mill site as all the water which passed over low bottom North would have to pass under mill and sluice way now; however, by making proper arrangements this additional amount of water could be taken care of.

"If this was properly done I consider the old mill site under present conditions more valuable than before road was constructed, as at times more water could be accumulated and consequently more power could be had.

"The mill washed out last time with a rise of '8 inches' in the channel; the low bottom North was not covered by water at all; a great deal larger body of water had collected many times and passed under the mill as creek was not full in banks when washout took place."

Wingate, one of defendant's witnesses, testified upon the same subject as follows:

"Q. Have you had occasion to be up there (at the Kirk mill) during high water?

"A. I have been there when the creek was high.

"Q. Were you ever there when the swamp was overffowed to such a depth as to swim a horse?

"A. No, sir.

"Q. Your judgment then is, the filling of two-thirds of the distance across that swamp does not interfere with the overflow to the extent of interfering with the mill purpose and operations?

"A. I do not consider it would interfere very much for the reason that there is a slough on the other side of the mill which has been filled up by the dump on the right of way, but at the same time there was a levee put across the mouth of this slough emptying in the creek below the mill and which I suppose was put there to hold the head water, a levee put across the mouth of this slough emptying in the creek below the mill."

By the Court: "Do you mean that the making of the embankment there across the lowlands on the other side does not affect the condition of the mill site, for the reason that the slough which runs out and empties into the creek dams up a part ofthe year?

"A. That is it; I do not consider that it would interfere with the flow of the water. It would make a small difference, but not a material difference.

"Q. (By Counsel.) Not even if overflowed across the bottom on the other side to a sufficient depth to swim a horse?

"A. Not in my opinion; it would not overflow where the mill is deep enough to swim a horse. Should it do so, it would, as a matter of course, make a difference."

It may be that events in the future may develop as a fact that the mill site has been destroyed by the construction of the road, but that condition of things has not been shown by anything which has occurred up to the present time.

If that fact should be developed by future events, plaintiffs will then have their remedy. We cannot act by anticipation and on possibilities, or even on probabilities. We do not think matters are in a condition to warrant us in dealing with the situation from the standpoint which plaintiffs urge us to view it from.

When we refer to the destruction of the mill site as a place of business by the construction of the road, we mean, of course, an improper construction of the road, for consequential damages resulting from the mere fact of the building of a railroad in the neighborhood

Kirk et al. vs. Kansas City, Shreveport & Gulf R. R. Co.

-would furnish no basis whatever for a demand against the defendant by the plaintiffs to recoup them for losses of that character.

We are inclined to think that the witnesses who referred to the value of plaintiffs' property as having at present a value of five or six hundred dollars as against a prior value of twenty-five hundred or four thousand dollars had in their minds a falling off in value for just such reasons.

Estimates made from that standpoint cannot be accepted.

It is no unusual circumstance for persons living along the line of .a projected railroad to entertain most exaggerated ideas as to the advantages which they will receive by reason of the building of the road.

On the strength of such belief they subscribe for stock and grant rights of way only to wake up later to a realization that so far from being benefited, they have lost their land, their money and their business.

As against unexpected results of that character, however disastrous, the Railroad Company is not a warrantor.

We question very much whether the value of the Kirk property would be very materially altered even if the mill were replaced and put into such condition as to effectually withstand all possible pressure which could be brought to bear against it; certainly not to the extent claimed by the plaintiffs.

The water mill would be there, it is true, and in good condition, but whether it would or could be operated so as to make it remunerative and to make the mill site a factor in increasing to any extent the value of the property, is problematical, in view of the number of the large steam mills controlled by large capital which have recently sprung up in the parish of Vernon, on or near the line of the road of the defendant company.

Plaintiffs' counsel have with ability and industry collated a large number of decisions touching the rights of land owners along the line of a railroad where property has been injured by the interference by the railroad with the flow of natural streams and the responsibility by the companies for such injury.

We do not question the correctness of the principles announced in them when proper existing conditions of facts call for the application of them.

We recognize it to be the duty of a railroad company where it

crosses a water course or would interfere with its flow of water or interfere with the drainage of adjacent lands, to construct the road so as not to impair its usefulness or do injury to the owners of the lands along the route; that this duty is a continuing one; that where the road is not properly constructed, each overflow incurs new cause of action for damages. (43 Illinois, 78.)

We repudiate the idea that a railroad company on the ground of its being a *quasi* public corporation acting for the public benefit can build its road so as to serve its own interests and can be permitted to do so to the injury of those who are as much entitled to the full benefit of their own property as the Railroad Company is of its.

We hold that if the exigencies of the situation should be such as to require absolutely and necessarily the building of a road in a manner which carries with it injury to other parties, the company is bound to hold them harmless from such damage, for we hold now, as we did in Bruning vs. New Orleans Canal & Banking Company, 12th Ann. 541, that usurpations and wrongs to private rights of property cannot be justified by any considerations of benefit to commerce.

If the mill and mill site have in point of fact been injured by the acts of the defendant company, we think plaintiffs would be entitled to require that the defendant itself place their property in thoroughly safe condition, this whether they be poor or whether they be rich.

The railroad company has no right to expect that the plaintiffs should advance money out of their pockets to relieve themselves from an injurious situation brought on by the defendant to which they in no way contributed.

Under our equity powers we could see that the defendant do justice.

As matters stand the verdict of the jury and the judgment of the court thereon rendered and appealed from herein cannot be sustained.

Plaintiffs' suit must be dismissed as of non-suit and without prejudice.

For the reasons assigned it is ordered, adjudged and decreed that the verdict of the jury be set aside and the judgment of the court therein rendered and herein appealed from, is annulled, avoided and reversed, and plaintiffs' suit is dismissed as of non-suit and without prejudice.

MR. JUSTICE BLANCHARD takes no part, having been of counsel.